Good afternoon, Your Honours. Good afternoon. May it please the Court. My name is Heather Fraley, and I represent the appellant, John Snow. I would like to reserve eight minutes for rebuttal. We simply don't have time today to discuss all of the important issues that are raised in Mr. Snow's briefs, so I'd like to focus the Court's attention on three main issues. First, Mr. Snow is entitled to equitable tolling of the AEDPA's one-year statute of limitations because he reasonably believed, based on a confluence of factors, that his amended petition would be timely if filed in accordance with the Court's scheduling orders. Second, Mr. Snow's trial counsel was ineffective for failing to investigate and present mitigating evidence. And third, the District Court clearly erred in failing to give Mr. Snow the benefit of Martinez v. Ryan as a mechanism to overcome the default of his remaining ineffective assistance of trial counsel claims. Unless this Court would like to begin elsewhere, I'd like to start by talking about Mr. Snow's entitlement to equitable tolling. Can we start instead with the procedural default involving the NAPU and Messiah claims? You argue, and assuming we agree with you, that Section 34.726 is not independent from federal law as applied to Mr. Snow's Brady claim. Why should we also find that it is not independent as applied to his NAPU and Messiah claims? Well, Your Honor, because the facts that went into the Nevada Supreme Court's consideration of all of those claims was very much interrelated. And just as the Court would have been looking to the evidence of the State's failure to disclose its relationship with Mr. Morelli in connection with the Brady claim, it would have been looking to that same evidence in connection with the review of whether the Messiah claim was defaulted. And similarly, with review of the NAPU claim, that the State knowingly presented false testimony as it related to the fact that he didn't have, allegedly, there was no deal given to him. So because the factors that are considered under Brady are so analogous to the factors that are considered in the merits of a Messiah claim and of the NAPUI claim, we believe, Your Honor, that the default bar would not be adequate as to those either. And in particular, Your Honor, in the Nevada Supreme Court, in dismissing those claims, does specifically state that there was no materiality issue. And certainly, the issue of materiality would have been relevant to those other claims as well. So because the holding that there was no prejudice was directly interrelated to the Court's assessment of materiality, for the same reasons under Cooper v. Nevin, this Court should find that the default bar was not adequate as to those claims. I have a slightly different question, but on a related topic. And that is, in reading the main text of the opinion, it seems clear that the Nevada Supreme Court is directing its attention to the claims generally. And it invokes the Nevada procedural default rule. And we only get into the materiality that you discuss in the footnote. And the Court then seems to direct that footnote only to the evidence that was not available before the trial court or was available prior to the trial. So, I'd be interested in your thoughts as to whether in fact, if by separating that out, we should look at these different aspects of the claims separately. Well, Your Honor, I would just simply note that the statement regarding materiality was general when it came to the Nevada Supreme Court, that the challenge of it was not material generally. So we do think that the Court was referring to all of the evidence. I mean, I hear you, but then the Court really starts out the footnote. We note that some of the evidence didn't exist before the trial and then goes on and talks about the materiality, it seems to me, with respect to that evidence. So why wouldn't we want to make that distinction as well? Well, Your Honor, even if the Court was to make the distinction that the post-trial evidence was not material, certainly we can demonstrate that the other evidence that was available was material. And that would include specifically the transcript of the proceeding in which Mr. Seaton, the prosecutor in Mr. Snow's case, states on the record that if certain things happen, a favorable disposition would be given to Mr. Morelli on that case. And so that is an example of something that was not turned over to Mr. Snow. He did not have access to, based on the State's open file policy. He had no reason to believe that anything like that existed. Certainly Mr. Morelli testified that there was no deal. But when we look to that evidence, and also when we look very importantly, also for our tolling argument, to the evidence regarding the CCDC logs, we see that Mr. Morelli was being visited multiple times by the primary detective in the case. And that certainly goes to supporting our argument that there was a deal going on. And as to whether the evidence was material, Mr. Morelli's testimony takes up the bulk of the State's penalty phase presentation. And certainly evidence that Mr. Snow had allegedly solicited the murder of one of the State's witnesses would have had a reasonable probability of affecting the outcome of this case. It was a close call in the penalty phase when it came to the aggravating evidence. The prior convictions that were presented in this case weren't particularly bad. A lot of them were very old. And so when you look to the evidence that Mr. Morelli received a deal, that he gives this very harmful testimony about what Mr. Snow allegedly did, certainly it would have been relevant to the jury's determination of whether death was appropriate and whether Mr. Snow would present a danger in the future. And indeed, the same... I'm sorry, Judge McGee, did you have another question about that? No, no. And so these same factors, particularly with regards to the materiality of the Brady claim and Mr. Morelli, are also highly relevant to our argument that trial counsel was ineffective in failing to investigate and present mitigating evidence. So in this case, first of all, we have the deficient performance prong, which was adjudicated on the merits by the Nevada Supreme Court. However, we believe that we are entitled to de novo review of that claim, first because the fact-finding process was inadequate based on the post-conviction court's failure to provide Mr. Snow with any sort of process. In addition, we can demonstrate that the Nevada Supreme Court's holding was both an unreasonable application of clearly established federal law as well as an unreasonable determination of the facts. So the Nevada Supreme Court held, as for the mitigation claim,  that he attributed to Snow's lack of cooperation, not to Houston's lack of diligence. This holding was an unreasonable determination of the facts because trial counsel himself admitted at the hearing that he only ever asked Mr. Snow for the names of people that could say one good thing about him. He admitted he never asked for the names of teachers, coaches, prior lawyers, doctors. He never sought out prison records of the prior convictions that he knew the state intended to present against him in the penalty phase of this case. It was simply not reasonable, a reasonable determination of the facts for the Nevada Supreme Court to hold that it was Mr. Snow's fault for failing to provide, basically volunteer mitigating evidence where the record is clear that trial counsel never asked. And that holding is particularly unreasonable when we look to this court's recent analysis in the Andrews v. Davis case, where this court held that where counsel did not need the client's help, it's not reasonable for him to fail to seek out evidence. And in this case in particular, we have a transcript from a 1970 drug conviction of Mr. Snow that contains 50 pages of testimony that could have been considered mitigating in this case. Trial counsel admitted he never tried to get it. He never sought it out. And he certainly did not need Mr. Snow's help to get that evidence, which clearly would have been relevant for him in trying to rebut the state's aggravating presentation in the penalty phase. So in addition, we can tell from the record here, the last question that Mr. Snow's trial counsel asked of Mr. Snow's mother, who was the sole witness who he presented and who testified for a mere four pages of transcript, his last question to her was, isn't it true that you didn't know until this morning when I told you in the hallway that you were here to testify in a capital case? In other words, he elicited on the record that she did not know until the morning of her testimony that her son was facing the death penalty. Clearly, it was an unreasonable determination based on those facts for the Nevada Supreme Court to blame Mr. Snow for trial counsel's failure to prepare. It was clearly below the standard of reasonableness at the time in 1984. And so because we have satisfied the deficient performance prong, this court's review of the prejudice prong is de novo. The Nevada Supreme Court never ruled on that issue. And when we compare the evidence that was presented, which again was four pages of testimony from Mr. Snow's mother, which was so uncompelling and so devoid of any evidentiary value that trial counsel himself didn't even reference it in his closing argument. Four pages of testimony from the mother, never referenced in closing argument. That was it. That was really the sum total of mitigating evidence that was presented. If all we do is compare that to the 50 pages of mitigating testimony that was provided in the 1970 drug conviction, if all trial counsel had done was obtain that transcript and present that evidence, there's a reasonable probability of a more favorable outcome here. Remind me, counsel, what's in that 70 pages? Yes, Your Honor. So in that 70 pages, we have testimony that Mr. Snow was raised in an economically disadvantaged area. And that's really critical here first because the prosecutor argued in closing in this case that it's not as if Mr. Snow was raised in, quote, the ghetto. In fact, the 1970 transcript explicitly says Mr. Snow was raised in a, quote, ghetto. In addition, those transcripts indicate that Mr. Snow's mother was addicted to diet pills and that as a result, Mr. Snow became addicted to drugs at the age of 12. Despite that drug addiction, Mr. Snow went on to go to high school and to college. He ended up having to drop out of college due to financial constraints and trying to support his children. It was also his attempts to pay child support for those children that led him to get his first armed robbery conviction, which was one of the aggravators that the state presented against him, one of the priors. After that, even after getting out of prison from that, Mr. Snow was able to get a job at Westinghouse. He was fired from that job due to his involvement in a civil rights committee in that business. After that, he received a back injury in 1968, which led him to be given pain medicine. That addiction to pain medicine turned into drug addiction. Let me just interject. The reason I ask that question is that none of that actually strikes me as particularly compelling mitigating evidence in a death penalty case. Typically what we are talking about there are, you know, issues with some kind of brain injury, some kind of horrific childhood abuse, that kind of thing. None of what you've just described strikes me as particularly compelling on that front. What I do remember being of note was, I gather that your client perhaps saved the life of a prison guard while he was incarcerated, and the jury never heard anything about that. I was wondering if there's something along the lines of kind of that rises to that level that's in those 70 pages, because the background, I remember the background of your client, and again, it's not a wonderful upbringing, but it's not nearly as horrific as what we often see in these cases. Yes, Your Honor, and I have three responses to that. So first, when this court conducts a prejudice inquiry, it has to compare what was presented against what might have been presented. So we're looking at basically no mitigation versus some mitigation. Second, the court must compare the sort of the aggravating nature of the crime itself, and in a lot of the cases like Andrew's, for example, where we do have sort of this crazy mountain of mitigating evidence, the crime in that case was so much more aggravated than the crime in this case, where we had a triple homicide involving rape and sodomy. Here we have a murder of an adult male victim by a single gunshot wound to the head. Certainly all murders are tragic, but when you're looking at the prejudice inquiry, it is relevant, the crime, and also the fact that no mitigating evidence was presented. And Your Honor, I would direct you to this court's holding in Smith v. Stewart, which was also a capital case that was tried in 1984, and in that case, the type of mitigating evidence that this court found to be relevant to the prejudice inquiry was precisely the kind of evidence we have here, Your Honor. So in that case, we have this court holding, and this is at 140 F. 3rd 1269. This court says, quote, We know that counsel could have at least pointed to Smith's sociopathic personality, his bad drug history, his change in personality after a large drug overdose, and his fine set of family relationships. That was it. That was all that this court had to see regarding prejudice in that case. Similarly here, we have the doctor's testimony at the 1970 proceeding that Mr. Snow had a psychotic personality disorder. We have the testimony regarding the disadvantaged upbringing, that he attempted to go to college and have jobs, that he became addicted to drugs as a result of a back injury, and that it was that drug addiction that led to every single one of his prior convictions. And so, again, when you're comparing no mitigating evidence against this mitigating evidence, and you're comparing it against the nature of the crime in this case, not to mention you're looking at all of this stuff together with the harm from the arguments that the prosecutor wouldn't have been able to make here if trial counsel had presented this. And if you look at it in conjunction with what happened on the record with Juror Buchanan, where that particular juror called the prosecutor during the penalty phase closing argument to warn him that the jury was going to, quote, let Mr. Snow go. So we know from the record that the jury was leaning towards a life sentence. And in fact, it was only after Juror Buchanan made a list of top 10 reasons outside of the record why Mr. Snow should be sentenced to death that the jury then sentenced Mr. Snow to death. So when you're looking at the cumulative impact of all of these things, and you're looking at the comparison of no mitigating evidence versus evidence of drug addiction that was stemmed from his mother's drug addiction, of a disadvantaged background, in a case that's not particularly aggravated, we do believe, Your Honor, that we can show a reasonable probability of a more favorable outcome in this case. Can I ask you a question regarding the Martinez-related claim, please? Yes, Your Honor. It looks like in Pellegrini, the Nevada Supreme Court explained that Section 34.726 did not take effect until January 1, 1993. Your colleague, Mr. Conner, on the other side, especially in the 920J letter on the eve of the March hearing today, filed a letter arguing that your client had until January 1, 1993 or January 1, 1994 to raise his claim of ineffective assistance of trial counsel. I guess I'd like to get your response. Is that correct? Well, Your Honor, my response is that that argument is waived. The state did not make that argument in the district court below. The state did not make that argument in its answering brief. That 28J letter is the first time that the state made that argument, and so our position is that it is correct that under 34.726, the Pellegrini decision in 2001 held that people had until one year after the enactment of 34.726. So by the time Mr. Snow was on notice that he could have filed something under that statute, the time had already passed. But the more important point, Your Honor, is that the state's argument fails because at the time of Mr. Snow's first state post-conviction proceeding, NRS Chapter 177 contained an identical time bar. And this court in High v. Ignacio acknowledged that Chapter 177 and 34.726 are interchangeable. So Mr. Snow would have been would have been subject to the exact same one-year time bar at the time of his first state post-conviction. Not only that, he was also subject to the successive petition time bar. So even if he had filed a petition within one year of Pellegrini, as the state is now arguing in the 28-J letter, that petition would have been barred as successive. So whoever determines this Martinez claim, do they, I guess, just to ask this in a different way, do they look at the 1986 state habeas petition, the first one, or do they look at his third state habeas petition in 1997 or in 2000, the habeas petition filing the fourth one in 2008? Your Honor, this court must look to the petition that was filed in 1986. And that is because whether we're applying 34.726 or we're applying Chapter 177, both of those statutes are clear. A petition must be filed within one year of the conclusion of the direct appeal in order to be timely under either of those statutes. So that was the operative petition. That was the petition that mattered. And indeed, the Nevada Supreme Court acknowledges that in the most recent opinion. It says, you didn't file within the correct time after the conclusion of your direct appeal. And that's telling, too, as to why the state's argument doesn't hold water. The Nevada Supreme Court doesn't cite to Pellegrini in its most recent opinion in the Mr. Snow's case. The Nevada Supreme Court doesn't say in Mr. Snow's 2008 opinion that, well, you had until one year after the enactment of 34.726 to file something. No. The Nevada Supreme Court says you are late because you filed 23 years after your direct appeal was concluded. So the Nevada Supreme Court's opinion here acknowledges that the default occurred because Mr. Snow did not file within one year of the conclusion of his direct appeal proceeding. And the operative petition, therefore, must be the 1986 petition, at which time he was being represented by First State Post-Conviction Council. But in any event, the standards that the district court imposed upon Mr. Snow to prove on the Martinez claim are simply not required under either Supreme Court precedent or this court's precedent. The court in Martinez and Trevino laid out a four-pronged test for whether a petitioner could overcome a default of an ineffective assistance to the trial counsel claim. None of those has anything to do with anything that the state or the district court is talking about, whether it relates to a causal nexus or whether it relates to an explanation of all of the time that supposedly elapsed between the First State Post-Conviction and the ultimate filing of the exhaustion petition, which is frankly really irrelevant to this point. And nor has this court. This court very recently in the Smith decision, just in the last month, I believe, applied Martinez to a default under 34.726 and didn't say anything about causal nexus or about the need to explain the entire length of delay. So there is simply no precedent for the district court's holding that Mr. Snow needed to satisfy those things. Your view then on Martinez is that there would be a remand and the district court would first apply the appropriate standards. Exactly, Your Honor, yes. And then go from there. Yes, Your Honor, yes. That there would be a remand for the district court to determine in the first instance whether post-conviction counsel was ineffective and whether the underlying claims had some merit. And then it would go from there. Yes, Your Honor, that is our position. So if I may spend a little bit of time here talking about our tolling arguments Mr. In this case, the district court dismissed 19 claims and subclaims from Mr. Snow's petition. But he among them was a claim that Mr. Snow's trial counsel was ineffective for referring to him using the N word during his penalty phase closing arguments as well as the claim I referenced earlier regarding the juror who injected extraneous information into the jury. Mr. Snow has never and will never received a merits adjudication of those claims because they were dismissed. This court should find that Mr. Snow is entitled to equitable tolling because he reasonably relied on a confluence of factors to determine that his petition would be timely if filed in accordance with the court's standard scheduling orders. As this court is aware Why does that remain true after the Supreme Court's 2005 decision in Mayall v. Felix? That's what I guess I'm stuck on. Your Honor, because Mayall was not instructive for petitioners like Mr. Snow who were already out of time. Mayall was instructive for people who had time left on their clock that they needed to make sure that they filed their amendments within their expiry time. By the time Mayall was decided, Mr. Snow was already long after time. There was nothing instructive in that case as to what he needed to do. But you waited I'm sorry, but you waited two years after Mayall was decided. It seems like there might have been some concern about that decision or how to interpret that decision as it applied to Mr. Snow that perhaps there should have been a motion or some sort of filing with the District Court to see exactly where you all stood in terms of time. I'm kind of puzzled myself why something like that didn't take place. First, Your Honor, because Mr. Snow did not think that his case was being governed by the AEDPA anyway. Based on the wording of the 1997 dismissal order, Mr. Snow didn't believe that his case was going to be governed by AEDPA and we did brief that the nature of the dismissal order stated that the AEDPA didn't apply, indicated that the court wished to retain jurisdiction over the case. So Mr. Snow didn't think that the AEDPA applied to him to begin with. Second of all, he had just been granted discovery. At the time that Mayall was decided in June of 2005, the court had just in April of 2005 granted his discovery motion. May I ask you about that? We'll make sure you've got sufficient time for rebuttal. I know your time is running down. I read those orders and it seems to me that in a case like this you could continue with discovery, people are asking with discovery, but the fact that the court granted discovery makes no substantive judgment it seems to me on whether you have a claim or you don't have a claim or you're too late or you should have done it before. So I have some trouble with that argument and maybe you can dig me out of this hole because I read and reread those district court orders and they seem to not be very definitive about the topic you're talking about or misleading. Your Honor, the reason that they're misleading is the same reason that the orders were misleading in Sosa and in Williams and that is because they conveyed to Mr. Snow that if he filed his petition in accordance with the orders that he would be timely. So when the court granted discovery it did so on the basis that the state had twice failed to comply with prior discovery orders that had been issued by both the state and the federal court and the court itself asked at 4 EOR 851 what other potentially exculpatory material has been withheld from disclosure. So in granting discovery the court acknowledged we don't know the quantum of evidence that has left that the state has failed to turn over. So therefore you get to discover all of this stuff and indeed Mr. Snow did not receive his first disclosure of evidence from the state until April of 2006 nearly a year after mail was decided. It's simply he didn't have any reason to believe at the time that mail came out with the discovery order just issued number one number two with a standing scheduling order that stated you shall file one final amended petition containing all of your claims for relief after discovery is completed and indeed the federal court continued to issue orders that said that even after mail. Even after mail the extension of time orders from the court said your amended petition should be filed after discovery was completed. So the district court clearly didn't think that mail had any impact on Mr. Snow's ability to file an amended petition otherwise those orders wouldn't make sense just as they didn't make sense in Williams. Similarly the state clearly didn't think that Mr. Snow's amendments would be untimely because it did not assert the time bar defense until five years after Mr. Snow filed his amended petition. Not only that after Mr. Snow filed his amended petition in 2007 the state stipulated to allow Mr. Snow to return to state court to exhaust his unexhausted claims because it acknowledged that he had good cause to do so. Certainly if the state thought in 2007 that Mr. Snow's petition was untimely it wouldn't have stipulated to allow him to return to state court for further proceedings thereby extending the proceedings further. So it's clear from the course of conduct of the parties that everybody believed that the amendments would be timely and it's also clear that Mr. Snow could have filed his amended petition sooner if only the state had complied with the orders. It's because... Thank you. Thank you. Okay. I'm going to take the remaining time. I have a question. Can I ask just one more question? Oh please. I guess I just want to hear from you why the letters  were insufficient to improper or I guess insufficient to properly allege a Messiah claim in 2004. Your Honor because we had no idea that the that the that the lead detective in Mr. Snow's case was communicating with Mr. Morelli prior to him giving his statement in this case and prior to the action that happened on the record where Seton represented that certain things would happen. It was only after we found out that those prior communications were happening that we had any indication that they had actually sent him in to talk to Mr. Snow. But and there still wasn't I mean based on what was written in the letters or and transcript there wasn't enough there to lead you down that path earlier? No Your Honor we knew there was a Brady claim and we raised a Brady claim but we did not know that there was a potential Messiah claim until we knew that the lead detective was going in to solicit this information from Mr. Morelli. It was our understanding that he simply came forward with this evidence. It was only after we saw that the detective went in to speak to him before he gave his statement and then after that and then right before his testimony that we were able to figure out that they had probably sent him in to obtain this information. Thank you. Thank you. Thank you. Mr. Conner. Good afternoon Your Honors. I may have pleased the court. Jeffrey Conner on behalf of the respondents. As my colleague noted there's a lot to cover in this case so if there's a particular area where the court would prefer that I start I'm happy to take any direction there. Otherwise I think I'd like to start with the Brady who Messiah claims out. Why doesn't Cooper control here? I think Your Honor I think Cooper doesn't control here for two reasons. First is that and as Judge Dew clarified in the motion for reconsideration on the motion to dismiss when you look at the Nevada Supreme Court's order here it doesn't actually apply the Brady analysis in deciding that there wasn't cause for the procedural default here. Instead what the Nevada Supreme Court determined was that Mr. Snow had discovered the basis for the Brady allegation and did not raise it within a reasonable time which he was required to do under state law. I don't think the Nevada Supreme Court did cite that Hathaway versus state decision in its own order but that is a 2003 Nevada Supreme Court decision that any new evidence that would give rise to a basis for cause to overcome a procedural default has to be raised within a reasonable time. So that was the basis for the Nevada Supreme Court's decision as to the absence of cause was that Mr. Snow knew about the evidence and didn't raise it within a reasonable time. So it wasn't assessing the actual Brady claim itself as opposed to what happened in Cooper where the Nevada Supreme Court said we look at deciding whether or not cause and prejudice have been established that dovetails with the elements of the Brady claim. That's not what actually happened here. The secondary thing is what counsel focused on with respect to the materiality issue here deals with an issue of prejudice and that in this court in the Moran case acknowledged that where the state court acknowledges that it is merely addressing the merits of a claim for purposes of addressing whether or not the petitioner can establish prejudice to overcome a procedural default. That does not intertwine application of the bar with the merits of the claim. So that doesn't affect the independence of the procedural bar. Can I ask you on the first point you raised with respect to the Nevada Supreme Court's analysis, if I recall the court did not separately address the Messiah claim. Am I right about that? I think it was addressing those claims together. That's the problem because the rationale you just offered does not extend to the Messiah claim. Given what we just heard from your opponent, it wasn't until 2007 that they discovered the critical piece of evidence that allowed them to plausibly lead to that claim. I don't know that they have I can remember seeing in the record where they acknowledged where they didn't acknowledge the Messiah claim, but to the extent that is true, if the separation in time for the discovery of that evidence in the raising of the Messiah claim in state court was made within a reasonable time, that would undermine the Nevada Supreme Court's decision. But that then just becomes an error of state law that's not reviewable by this court. What would need to happen is that doesn't affect the independence of the bar. That just leads to the question of whether or not under the federal analysis there's cause to believe that the Messiah is the Messiah. I hear the case that you're quoting, but how is it if the court is actually determining that these disclosures were not material, why isn't that relying on Brady? I'm not sure that's why I said it's not relying on Brady, Your Honor. What I'm saying is what this court said in Moran is that if a state court is analyzing  of federal law for purposes of determining prejudice in a cause and prejudice analysis, that doesn't intertwine with application of the bar. And I think that comes to a very fundamental point in how state procedural default rules work, or at least how Nevada's rules work, is that you have a state procedural bar, and then there are exceptions to the bar. So there is a decision to apply the bar, the bar is applied by the court, and then they do the analysis to see whether or not cause and prejudice can be established to get beyond the bar. The decision to apply the bar itself is not dependent on any federal question at that point. The federal question is whether or not they can show cause and prejudice to get past the bar. And then you have the Cooper case. So how does your argument fit with the Cooper case? Well, with respect to Cooper, I think that potentially you do have an intracircuit conflict between Moran and Cooper, that Cooper would say that that does intertwine the application of the bar with the Brady analysis. Moran says it wouldn't. So you potentially have an intracircuit conflict there. That's a problem. And I can't tell you guys how to resolve it because at least my understanding in this circuit is that the only way that can be resolved is by the ombud court. You're correct about that and then we have to figure out whether it's a conflict or whether of course Moran is one case and Cooper is another and then Cooper tells us to go case by case. So that will have to do. Can I ask you about Martinez? Certainly. I'm trying to figure out what you raised in the 28J letter was whether that was waived. You failed to raise it until one week before the last oral argument was scheduled. And assuming it's not waived, are you saying that Snow's ineffective assistance of counsel claims are procedurally defaulted because they were not raised before January 1, 1994? Am I understanding your argument? Well, I think if you look at this court's decision in Williams v. Filson, this court addresses that issue and that's where I was relying on that argument from. Now certainly the court could decide that respondents could have raised that  I don't know if that comes from, you know, in this case isn't cited in the briefing or anything like that, but Wood v. Milliard from the U.S. Supreme Court about waiver of a procedural defense versus forfeiture of just having overlooked the issue. I think that that issue might have just been overlooked in briefing the procedural default issue, but as this court explained in Williams v. Filson that there might have been up until the Pellegrini decision was decided in 2001, there might have been some room there for petitioners to say, well, we didn't quite know how the 34-7-26 bar was going to apply with respect to successive petitions, but once Pellegrini was decided, that put them on notice, and at least after Pellegrini was decided, they needed to do something, and here you don't have the fourth state habeas petition not filed until 2008. That's a seven-year delay from the decision in Pellegrini until the fourth state post-conviction petition was pursued. I think your colleague on the other side argued, and I guess I'd like to hear your response to that, that the state procedural bar that the Nevada Supreme Court relied on to dismiss Mr. Snow's claims was preceded by section 177.315, which apparently imposed an identical one-year statute limitation, so does it really matter that section 34.726 only took effect on January 1, 1993? I'm not familiar with the case that my opponent referenced  don't know if the court would want additional briefing on that. I'd be happy to provide that. What I can say is that if you look at the Pellegrini decision itself, this goes back to a confusing aspect of Nevada law from the 70s and 80s, that there used to be two different post-conviction remedies. Petitioners could file a chapter 177 petition and a chapter 34 petition. They were two separate things, but they were both petitions for rid of habeas corpus. The chapter 34 bar under 34.726 was newly put into place in the early 90s when they got rid of the chapter 177 remedy to streamline state habeas in Nevada and make it a singular remedy. That was a new bar that was created and went into effect on January 1st, 1993, as your honor mentioned. The default from that bar doesn't occur until January 1st, 1994. They were two separate remedies. Like I said, I'm not familiar with the case my colleague referenced that said that 177 and chapter 34 are interchangeable. I think the Nevada Supreme Court would probably emphatically disagree with that. And that's because understanding the history of post conviction remedies in Nevada, chapter 177 and chapter 34 simultaneously existed and they were separate remedies. What about the standard under the Martinez in terms of it being a federal standard and not a state standard? What is the state's position on that? I think my colleague is correct in the sense that the cause standard for prejudice when you're applying Martinez is a federal standard. That being the case, though, Martinez is an equitable ruling. It's not a hard and fast rule. And it seems problematic to me that Martinez would create a situation where a petitioner could discover evidence to raise a new ineffective assistance of counsel claim, sit on it for a long time, and then raise it in state court, let the state court procedurally default it, and then use Martinez as a basis for cause to overcome the default. That seems problematic to me. Martinez is supposed to be an equitable  I think there's arguments that would counter the filing of the petition, but on a more precise level, isn't that something the district court needs to decide and not on appeal? And I appreciate your candor about the standard. You're not responsible for that. But if the wrong standard was used, why wouldn't we send it back and let the district court apply the correct standard? I think that's probably appropriate, your honor. If you think that the appropriate remedy for that would be a remand to let her decide that issue, I think especially because that is a pretty fact-bound issue that would be appropriate for the district court to decide in the first instance. Thank you. If the court doesn't have any further questions on that step, I would like to address counsel's argument with respect to ground 10 K and the ineffective assistance of counsel with respect to investigation of mitigating evidence. A lot of what counsel discussed is evidence with respect to counsel's alleged ineffectiveness that was procedurally defaulted by the district court and is not presented on the merits in this appeal. What happened in the district court is that the vast majority of the evidence with respect to ground 10 K was procedurally defaulted with the exception of the evidence that Judge Watford presented with respect to under covering the plot to murder a prison guard. And there was some reference to two doctors from a prior criminal proceeding that had made some mental health evaluations for Mr. Snow. One significant problem I see with that, those two aspects of the claim excluding the procedurally defaulted evidence, certainly if the Martinez issue is going to go back to the district court, then the additional evidence may come into play, may not, depending on how the district court resolves the issue. But the issue presented on the merits that was decided by the Nevada Supreme Court, certainly under pinholster in the Supreme Court's case, you can consider evidence that was not presented to the Nevada Supreme Court when it addressed the ineffective assistance of counsel claim on appeal in Mr. Snow's first post conviction proceeding. As a result, the two pieces of evidence that do remain, the source for those evidence, that evidence that Mr. Snow cites in his petition, is an affirmation and an affidavit that were written in 1986. It's not clear to me how it is that counsel can be ineffective for failing to find documents that haven't been created yet. When you look at those documents, the information that's in those documents is actually information that counsel would have needed Snow's assistance to be able to identify and find that information. We're not talking about counsel's failure to go find the court record. If you look at the district court record and pull the affidavit that was filed in 1986, he acknowledges that he talked with the doctor and the doctor wasn't sure that his testimony had been transcribed. I don't know that they have pointed to a transcript where that information would have been available. Additionally, the information about under covering the plot on the murder of the prison guard, that wasn't in Mr. Snow's testimony.  you look at the prison records or anything like that, that's referenced in another document that wasn't created until 1986. I'm struggling to understand how it is that counsel could be expected to find those things without Mr. Snow's assistance, which was the basis for the Nevada Supreme Court's decision on the deficient performance prong with respect to the claim that was raised in that first state post-conviction appeal. So, without Snow's assistance in being able to find that evidence, counsel can't be ineffective for not finding that. And one correction to make, I did in one of my 28-J letter that I did file addressing ground 10-K, I mistakenly said that the district court did not address the prejudice prong with respect to 10-K. I apologize for that. But, I think the merits of 10-K as it exists before this court fails because the Nevada Supreme Court was reasonable in determining that counsel couldn't have been expected to find that evidence without Mr. Snow's help. Thank you. Can I ask you about  Messiah  Mr. Connor? CHUCK CONNOR Sure can. DEBRA COHEN OK. It looks like you're arguing Snow could have raised that claim based solely on the transcript of Morelli's probation hearing and the evidence on his behalf which he discovered in March of 2004. I guess I asked a corresponding question to your colleague on the other side. How could he have used the transcript of the letters to Snow in March  2004? CHUCK CONNOR I   the answer to that question. I don't know the answer to that question. I don't know the answer to     question. CHUCK GREG CAN YOU ADDRESS EQUITABLE TOLLING? CHUCK The fact they waited two years after that was decided to file the amendment is pretty significant. But I think there's another aspect of this that's not being addressed and that is the Duncan v. Walker case which was decided earlier in 2002, I believe, where the Supreme Court acknowledged that a pending federal habeas petition does not toll the statute of exceptional limitations. And then you combine that with Pace v. DiGuglielmo and the application of the decision there with respect to the fact that a non-timely state petition doesn't toll because it's not properly filed and that if you have concerns about whether or not you're going to be timely or not in state court, you can file a non-timely  And that's the main argument that your opponent is pressing which is that they were told that you get one more shot to file your last and final petition that must include all claims. And they could not do that until they received discovery. You all on the state side fought them tooth and nail to prevent them or at least to delay and hinder them in getting the discovery that they ultimately were entitled to. And so it would have made no sense for them to file a half-baked petition midstream without having obtained all the discovery only to be told, listen, counsel, I told you, you got one more shot. I don't care that you got all this unbelievably powerful evidence afterwards. You filed your one petition and that's the end of the story. I'm very understand your honor's position but I'm very hard pressed to believe that after the mail decision had come out, if they had filed a motion that said look, this new decision came  this changes the way our understanding about how relation back works, we need to file this petition now to protect our client's rights and that the district court would not have allowed them to do that and subsequently file another petition when discovery was complete. I also would be hard pressed to find that a panel of this court would conclude that it wouldn't have been an abuse of discretion for the district court to not allow that to happen once mail was decided. And the final thing is that when you look at that if they filed an amended complaint within some range of the mail decision, would it have been timely? It wouldn't have been timely, your honor, but there would have been a stronger argument for equitable tolling. Once all these cases started getting decided, because there was a lack of clarity in the law, that was a basis for them to seek equitable tolling. But once all these decisions started being made, that put them on notice. The other thing is that in 2004, the Supreme Court decided Plylar v. Ford, where the court acknowledges that unless there's something that's affirmatively misleading in the order, then it's not a basis for tolling. And so their reliance on the order in this case was not reasonable in light of all these Supreme Court decisions that were telling them the statute of limitations is going to apply to you. In 2005, they know here's what the Relation Back standard is. And honestly, that's how Relation Back ought to work, is that they should have filed an amended petition that threw in everything that they knew. And you have to understand, when you combine this also with the standard of what they're supposed to have to do to get discovery, and Your Honor mentioned that you read those discovery orders very closely. Judge Pro is very specific about they were only allowed to do discovery on things that were tied to things that were actually in their petition. Well, Counsel, if it was so clear what the effect of mail was, then I don't understand why you all delayed for years and years and years and finally raising the statute of limitations. Well, I think in this instance, if you look at, you know, they filed a motion for judicial notice in this case, and all the motions to dismiss where our office didn't raise the statute of limitations with respect to the relation back issue, they stopped after two mails decided in 2005. The last one, I think, was from October of 2005, where the attorney that filed the motion to dismiss in that case acknowledged that he wasn't going to raise mail because he acknowledged that there was a good argument there from the other side that we had acquiesced in this pattern of conduct for years and we can't raise that now, but then here, you know, he went back to state court and litigated his petition in state court. Could we have said it's untimely, there's no need to do a motion to dismiss in this way? Certainly, we could have, but I don't think that waves the defense, Your Honor. Your argument that everything was so crystal clear that any competent lawyer in their position would have known to do X or Y strikes me as it confirms the reasonableness of everything they did. I don't think it has to be only a competent, this is the only conclusion a competent lawyer would reach, it's a reasonableness question, and that they have to be reasonably diligent in protecting their rights when you're looking at equitable tolling. I think this is a situation where both prongs of the equitable tolling analysis collapse into each other because he has to show that he's being reasonably diligent in protecting his rights. So that's another thing here, Your Honor, that even assuming this court concludes that the orders and everything would give rise to a basis for tolling, I think there probably needs to be a remand to the district court to assess diligence all the way through filing. But it's an area where I think that all collapses together, and I don't know that the standard is that the only conclusion to reach is that it has to be reasonable for them to rely on that, and I just don't see that that was reasonable at that point in time. Mr. Snow filed his March 13, his March 13, 2003 amended petition  I believe. It was not until the court appointed the federal defenders as his counsel that he filed his amended petition pro se Does the fact that he was proceeding pro se excuse his failure in any way to meet the one year statute of limitations? I don't think it's a factor. One, I would acknowledge that if you look at the signature page on that 2003 petition, it's actually signed by an attorney. It was one of the state post conviction attorneys who actually signed the petition. But I see that I'm over my time. If I could finish answering. It doesn't that may be a factor with respect to the 2003 issue, but I think that at this point is a non-factor because of the Williams decision. I think Judge Dew's analysis is consistent with this court's decision in Williams. And so because of the lack of clarity in the law with respect to Duncan and Pace versus Digliomo, his 2003 petition is entitled to equitable tolling. So the pro se aspect of it I don't think comes into play there. And it's not an issue with respect to the 2007 amendment petition because the federal public defender had been representing him for three years at that point.  No further questions? Thank you, Mr. Conner. Thank you, Your Honor. Hello, Your Honors. Can you hear me? I just want to say that they declined to raise a timeliness argument in a capital case in the District of Nevada even after mail was decided. Clearly the state did not believe at the time that petitioners would be untimely and there was still a lack of clarity for petitioners like Mr. Snow whose expired before mail was decided. He was clearly diligent in litigating the discovery. It was the state who prolonged those proceedings for so long by failing to comply with the orders. For all the reasons we stated today and in our briefing, we believe we are entitled to tolling. Turning to the Messiah issue, Your Honors, the state is literally relying on Mr. Snow to file multiple motions to compel the state to turn over the evidence. The state cannot hide evidence and then blame a petitioner for failing to raise a claim on the basis of that evidence any sooner. Similarly, as it relates to the Messiah claim, whether he would have been on notice because there was a petition, every time a petitioner had a Brady claim, they would be required to file a Messiah claim just in case. There was no evidence of a Messiah violation in this case until we had the logs. We could not get the logs until the state finally was forced to turn them over. As soon as the proceedings were completed, we filed the petition within less than two months after we received the discovery. For that reason, that claim ought to be deemed timely. When it relates to this issue of the intertwining, clearly under Cooper v. Nevin, the issue was intertwined. We would argue that Foster v. Chapman and the merits under RIPPO as part of the default ruling is not independent. Turning to the ineffective assistance issue, there is no penholster problem here because this court is doing de novo review. It is beyond dispute that the   court is doing de novo review. Thank you. Thank you, counsel, both for the argument today and the briefing. The case just argued is submitted and we are adjourned for the afternoon. Thank you.
judges: McKeown, Murguia, Watford